**Andrew J. Shamis,** Florida Bar No. 101754
ashamis@shamisgentile.com
**Edwin E. Elliott,** Florida Bar No. 1024900
edwine@shamisgentile.com
SHAMIS & GENTILE, P.A.
14 NE 1st Ave., Suite 705
Miami, Florida 33132
Telephone: (305) 479-2299

**Scott Edelsberg**, Florida Bar No. 0100537
scott@edelsberglaw.com
EDELSBERG LAW, P.A.
20900 NE 30th Ave., Suite 417
Aventura, Florida 33180
Telephone: (786) 289-9471

**Whitney Stark**, OSB No. 090350
whitney@albiesstark.com
ALBIES & STARK
1500 SW First Ave., Suite 1000
Portland, Oregon 97201
Telephone: (503) 308-4770

**Attorneys for Plaintiff**

[*Additional Counsel on Signature Page*]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| CHANDA FREE, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>vs.<br><br>ARTISAN AND TRUCKERS CASUALTY COMPANY,<br><br>    Defendant. | Case No.<br><br>CLASS ACTION COMPLAINT<br>Breach of Contract Action (28 U.S.C. § 1332(d), 1441(a)-(b), and 1453)<br><br>DEMAND FOR JURY TRIAL |

PAGE 1 – CLASS ACTION COMPLAINT

Plaintiff Chanda Free ("Plaintiff"), by and through undersigned counsel, brings this class action, individually and on behalf of all others similarly situated, against Artisan and Truckers Casualty Company ("Progressive" or "Defendant") and alleges as follows:

## INTRODUCTION

1.　This is a class action on behalf of Plaintiff and all other similarly situated claimants in Oregon who received a payment for the loss of a totaled vehicle from Progressive where Progressive used valuation reports prepared by Mitchell International, Inc. ("Mitchell") to determine the actual cash value ("ACV") of the loss vehicles. Through Mitchell's valuation, Progressive systemically thumbs the scale when calculating the ACV of claimants' loss vehicles by applying so-called "Projected Sold Adjustments" that are: (a) arbitrary; (b) contrary to appraisal standards and methodologies; (c) not based in fact, as they are contrary to the used car industry's market pricing and inventory management practices; (d) not applied by the major competitor of Defendant's vendor Mitchell; and (e) on information and belief, not applied by Progressive and Mitchell to insureds in other states like California and Washington.

2.　In the event of a "total loss" to an insured vehicle—*i.e.*, where repair of the vehicle is impossible or uneconomical—Progressive's uniform insurance policies with Plaintiff and all putative Class members (defined below) promises to pay for the loss, limited to the ACV of the vehicle. Attached as Exhibit A is a copy of Plaintiff's Policy ("Policy"), which is materially identical to the policy for all members of the putative Class.

3.　When valuing total loss claims for vehicles, it is improper for an automobile insurance company, such as Progressive, to undervalue and underpay the claims by manipulating the data used to determine the ACV of the vehicles. Specifically, under its insurance policy terms and applicable Oregon law, Defendant has a duty to pay, and represents that it will pay, the ACV of a loss vehicle when adjusting total loss claims.

PAGE 2 – CLASS ACTION COMPLAINT

4. Notwithstanding these obligations and representations, Defendant fails to fulfill this obligation by taking advantage of a valuation process that employs improper and unreasonable adjustments to reduce the value of comparable vehicles specified in the valuation reports, which in turn reduces the valuation of the total loss vehicles and the corresponding claim payment.

5. Specifically, Defendant, through Mitchell, systemically applies a so-called "Projected Sold Adjustment" that results in a significant downward adjustment to the base values of the comparable vehicles used to calculate the ACV of Plaintiff's and Class members' total loss vehicles. This reduction is contrary to the industry-standard comparable, or "comp, methodology for appraising ACV" and is not based in fact, as it is contrary to the used car industry's market pricing and inventory management practices. The adjustment is applied to each of the comparable vehicles on top of adjustments for differences such as mileage, options, and equipment. The only purported explanation for the downward adjustment appears on the last page of the valuation reports and is a general, nondescript statement claiming that the reduction "reflects the fact that consumers typically negotiate a purchase price less than the list price." Exhibit B, Plaintiff's Valuation Report at 8.

6. Neither Progressive nor Mitchell has ever conducted any study or research to determine whether such consumer negotiation exists and impacts ACV in the modern used-car market. Worse than this complete lack of curiosity is that Defendant thumbs the scale by discarding vast amounts of relevant data that contradict applying a Projected Sold Adjustment. For example, until July 2021, Defendant, through its vendors, simply threw out all data where the list price equaled or exceeded the sold price. And to this day, it persists in excluding from Projected Sold calculations some data where the list price equaled sold price and all data where the sold price exceeds the list price, even though examples abound of dealerships that charge more than advertised price to customers purchasing a vehicle with cash—i.e. not providing the dealer the

PAGE 3 – CLASS ACTION COMPLAINT

opportunity to profit through financing the sale or acquiring a trade-in—which is particularly relevant to the inquiry of determining a vehicle's ACV. Defendant fails to control for whether the vehicle was purchased with cash, or whether there were ancillary purchases or transactions that may influence the "sales price" but not the ACV (e.g., whether the customer traded in a vehicle at time of purchase, bought an extended warranty or service plan, or financed the purchase).

7. Nevertheless, Progressive applies a Projected Sold Adjustment to the advertised (or listed) price of comparable vehicles when calculating the ACV of total-loss vehicles. For Plaintiff, the Projected Sold Adjustment was approximately 2.3% of two of the five comparable vehicles' value prior to adjustments. To arrive at the Projected Sold Adjustment amount, however, Progressive, through third-party vendors, and as set forth above, categorically excludes transactions that undermine its flawed thesis: for example, transactions where the sold price exceeds list price, transactions from dealerships who market themselves as "no-haggle" dealerships, and every transaction where the sold price equaled the advertised price.

8. As explained herein, the used auto market is such that, given the ubiquity of Internet advertising and comparison shopping and developments in sophisticated pricing software, car dealerships price their vehicles to market and list that market price online. Any difference between a list and sales price cannot, as Progressive does, be reflexively attributed to a negotiation of the vehicle's *cash* value, as dealers regularly shift profits to other components of the transaction: for example, profits made through financing or trade-in or ancillary products described above, or that the dealer applied a generally unavailable discount to the cash value of the vehicle (such as employee discount, loyalty discount, military discount, or friends/family discount). But Progressive ignores these market realities and is content with paying insureds and claimants below-market prices for their totaled vehicles.

/ / /

9. Put simply, Progressive's assertion that it is a "fact" that consumers "typically" negotiate down the list price of used autos is completely false.

10. To arrive at its (incorrect) conclusion that consumers negotiate down the list price of used autos, Progressive, through its vendors, intentionally distorts the data, excludes transactions that undercut its false hypothesis, and ignores market realities, all for the purpose of applying a capricious and unjustified Projected Sold Adjustment to artificially deflate the value of total loss vehicles.

11. This pattern and practice of undervaluing comparable and total loss vehicles when paying automobile total loss claims through arbitrary, unsupported, and unjustified adjustments, which benefits the insurer at the expense of the insured, violates Defendant's policies with its insureds.

**PARTIES**

12. Plaintiff Chanda Free at all relevant times, was an Oregon citizen. At all relevant times, Plaintiff contracted with Defendant Artisan and Truckers Casualty Company for automobile insurance. On or about January 17, 2024, Plaintiff was in a car wreck, and Defendant deemed her vehicle to be a total loss.

13. Defendant Artisan and Truckers Casualty Company is an Ohio company with its principal place of business in Ohio. Defendant Artisan and Truckers Casualty Company is a subsidiary of Progressive Group entities. Defendant provides insurance coverage throughout the United States for first-party property damage under collision and/or comprehensive coverage. At all relevant times, Defendant conducted business in Oregon through insurance agents and other company personnel.

/ / /

/ / /

**JURISDICTION AND VENUE**

14. Minimal diversity exists under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), 1441(a)-(b), and 1453. Plaintiff and the proposed class members are citizens of the State of Oregon. Defendant is an Ohio Corporation that has its corporate headquarters in Ohio, and, at all relevant times hereto, Defendant was engaged in the business of marketing and selling insurance policies and adjusting insurance claims in the State of Oregon.

15. Plaintiff estimates that there are more than 100 putative class members, and the aggregate compensatory damages (in the amount of the Projected Sold Adjustment that were deceptively deducted), claimed by Plaintiff and the Class are estimated in good faith to exceed $5,000,000.00.

16. Venue is proper in this District under 28 U.S.C. § 1391, as a substantial portion of the conduct giving rise to Plaintiffs' claims occurred in this District, and Defendants transact business in this District.

**FACTUAL ALLEGATIONS**

**Defendant's Systemic Application of Projected Sold Adjustments**

17. On January 17, 2024, Plaintiff was involved in a car wreck and sustained physical damage to her vehicle. At the time of the car wreck, Plaintiff was contracted with Progressive for automobile insurance through a policy underwritten by Artisan and Truckers Casualty Company.

18. Like all members of the putative Class, Plaintiff made a property damage claim to Defendant.

19. Pursuant to uniform policies and procedures, Defendant declared Plaintiff's vehicle to be a total loss and purported to pay her the ACV of her loss vehicle, as Defendant promised and represented it would under the uniform provisions of its insurance policies and Oregon law.

/ / /

20. When calculating its valuations and claims payments, Defendant systemically employs a routine "total loss settlement process." This process involves obtaining a "Vehicle Valuation Report" from Mitchell and relying upon the valuation provided by Mitchell as the ACV amount owed under the policy. Defendant provided a Mitchell Vehicle Valuation Report for Plaintiff on January 29, 2024. *See* Exhibit B.

21. The Mitchell Vehicle Valuation Reports used by Defendant during the relevant period followed the same process, provided and disclosed the same or substantially the same material information, and presented that material information in the same or substantially the same format. These valuation reports purport to contain values for comparable vehicles for sale in the claimant's geographic area. The reports also contain a purported valuation of the loss vehicle based upon these prices for comparable vehicles listed in the report. The report then adjusts the advertised prices of those comparable vehicles to account for differences in equipment, mileage, and vehicle configuration. Exhibit B at 8.

22. In addition, however, the valuation reports used by Progressive make a further adjustment to each loss vehicle called a "Projected Sold Adjustment." For Plaintiff Free, Projected Sold Adjustments in the amounts of -$473.00 and -$444.00 respectively, were applied to two of the five comparable vehicles. Exhibit B at 6-7.

23. Defendant provides no data specific to the comparable vehicles or any explanation of industry practices in its valuation reports to support *any* Projected Sold Adjustment, much less the specific downward adjustments used in Plaintiff's valuation report. Instead, the *only* explanation is buried on the last page of the report, stating in full: "Projected Sold Adjustment – where the comparable vehicle is listed for sale, this adjustment reflects the fact that consumers typically negotiate a purchase price less than the list price. (There is no projected sold adjustment

/ / /

where the comparable vehicle has actual sold data or where a vehicle is listed for sale at a 'no haggle' dealership)." Exhibit B at 8.

24.     In truth, Defendant's Projected Sold Adjustments do not reflect "factual" market realities (the context in which consumer purchasing occurs) and run contrary to customary automobile dealer practices and inventory management, where list prices are priced to market to reflect the intense competition in the context of Internet pricing and comparison shopping. Before the ubiquity of online advertising and shopping, "advertised" prices had very little to do with eliciting car buyers to particular dealerships—instead, car buyers generally went to their local used car dealership that had the desired vehicle in stock for sale. The "advertised" price was simply whatever price was listed on the physical window. And consumers could not, as they can now, easily compare that price to Internet advertisements of the same vehicle offered by competitors.

25.     As such, dealerships generally priced vehicles above market knowing that some consumers might be poor negotiators, and they would realize an inflated profit on those sales. This above-market "window" price obviously allowed for negotiation, and a downward negotiation would often occur.

26.     But during the Class Period, that is simply no longer how the used car market operates. Now, given the need for Internet advertising, the prevalence of Internet shopping and consumer behavior, developments in sophisticated pricing software universally used by car dealerships, and the ease with which consumers can compare the advertised prices of identical vehicles across multiple competing dealerships, used car dealerships no longer price vehicles above market with room for—and the expectation of—negotiation. Instead, car dealerships use sophisticated pricing software—which provides the advertised prices of all competitors; the average "turn" of a given year, make and model; etc.—and now appraise vehicles before acquiring them to price them to market and do not negotiate from that price.

27. This makes sense, because if a car dealership priced a vehicle above market with room for negotiation, consumers would simply not go to that dealership. This is because consumers can easily compare list prices and would seek out the vehicle priced to market, rather than the same vehicle priced at a higher amount (i.e., above market). Given the choice between paying less or paying more for an identical vehicle, consumers will choose to pay less.

28. As such, a negotiated discount off the cash price is highly atypical and speculation about the (always lower) amount a vehicle might sell for is not proper to include in determining ACV. The inclusion of this significant downward adjustment purportedly to "reflect[] the fact that consumers typically negotiate a purchase price less than the list price" is particularly improper in the context of this action—insureds who have suffered a total loss of their vehicle and need to procure a replacement have limited time to search out the illusory opportunity to obtain the below-market deal Defendant assumes always exists without any explanation or support.

29. Defendant's Projected Sold Adjustments are contrary to appraisal standards. Defendant begins the process of valuing loss vehicles using the industry-standard comparative methodology but improperly deviates from that process by thumbing the scales against the insured. Defendant documents the loss vehicle's and each comparable vehicle's mileage, options, and trim, which are compared in the report, and makes dollar adjustments accordingly. Plaintiff does not challenge these documented adjustments. At this stage of the process, however, Defendant abandons the comparative methodology. Appraisers employing the comp methodology use list prices and make adjustments based only on observed and verifiable data; appraisal standards do not permit arbitrary adjustments from the advertised price based upon undocumented and unverifiable projections.

30. Defendant thumbs the scale by discarding vast amounts of relevant data that contradict any application of a Projected Sold Adjustment and by failing to control for material

variables, including whether there were ancillary purchases or transactions that may influence what is recorded as the "sales price" but do not influence the ACV (e.g., whether the customer traded in a vehicle at the time of purchase, bought an extended warranty or service plan, or financed the purchase).

31. Further, applications of the PSAs and exclusion of the data to manufacture support for it violates Progressive's contractual duty to determine the ACV of insured vehicles based on the vehicle's "market value, age, and condition." By applying the PSAs, Progressive is not determining ACV based on actual market value, but rather based on a false, artificially low, skewed "market" of its own invention.

32. Until July 2021, Defendant excluded from the calculation of the Projected Sold Adjustment all transactions in which the list price of a vehicle equaled the sold price.

33. Even after July 2021, Defendant still excludes some transactions in which the list price of a vehicle equals the sold price.

34. Defendant has excluded and continues to exclude from the calculation of the Projected Sold Adjustment all transactions in which the sold price of a vehicle is greater than the list price.

35. Without having performed any investigation or study, Defendant simply assumes all such transactions are anomalies.

36. Likewise, Defendant has not exercised even a modicum of curiosity to investigate whether market realities support the application of a Projected Sold Adjustment. Nor does Defendant or its vendors attempt to verify—even a single time—for those transactions where the list price exceeded the sold price, whether the reason for the reduction was negotiation of the cash price of the vehicle and not some other (far more likely) reason, some of which are discussed herein.

37. Neither Progressive's form Policy nor Oregon law permit reducing a vehicle's value for invented or arbitrarily assumed justifications.

38. These unjustifiable, errors, of course, skew the data in favor of Defendant to the detriment of the insureds.

39. Moreover, examples abound demonstrating the glaring error of Defendant's cherry-picking practices.

40. For example, related to the exclusion of sales prices greater than list prices, all list prices for comparable vehicles listed in Defendant's valuation reports are scraped from Internet sources—specifically Cars.com, Autotrader.com, Vast.com, and TrueCar.com.

41. The list prices many dealerships publish on these websites include discounts for consumers who are financing and providing a trade-in. Thus, a consumer who was not financing the vehicle through the dealership or who was not trading in a vehicle—obviously, insureds who sustained a total loss almost certainly are not trading a vehicle when purchasing a replacement vehicle—would have to pay in cash more than the price listed on sources where Mitchell scrapes advertisements for comparable vehicles. In determining the ACV of Plaintiff's and class members' totaled vehicles, there is no justification for Defendant to have excluded those transactions from calculating the Projected Sold Adjustment, while only including transactions where the sold price was recorded as less than the list price.

42. Simply put, there is no justification for Progressive to exclude such transactions as outliers or mistakes when justifying how it calculates the amount of the so-called Projected Sold Adjustment.

43. Doing so serves only to skew the data to meet Defendant's unjustified, unsupported, and uninvestigated assumption that the list price of comparable vehicles should always be reduced to pay insureds less.

44. Defendant further fails to control whether the vehicle was purchased with discounts unavailable to the public (e.g., employee discounts).

45. Defendant also fails to control for whether the vehicle was purchased with cash, or whether there were ancillary purchases or transactions that may influence the recorded "sales price" but not the ACV (e.g., whether the customer traded in a vehicle at the time of purchase, bought an extended warranty or service plan, or financed the purchase).

46. In these instances, the ACV of the vehicle remains its list price; the dealership simply transferred the anticipated profit through either the sale of an optional ancillary product or by reducing what it would have offered in trade-in value.

47. The impropriety and arbitrariness of Defendant's Projected Sold Adjustments are further demonstrated by the fact that Mitchell's primary competitor in providing valuation reports to insurance companies—CCC Intelligent Solutions, Inc.—does not apply projected sold adjustments. Instead, CCC Intelligent Solutions uses list prices.

48. On information and belief, the impropriety and arbitrariness of Defendant's Projected Sold Adjustments are further demonstrated by the fact that Progressive does not apply these adjustments when determining the ACV of total losses in California or Washington. There is no justification for applying these adjustments when valuing total losses in Oregon while not subjecting California and Washington insureds to the same negative adjustments.

49. Plaintiff and each member of the proposed Class was damaged by Defendant's application of these Projected Sold Adjustments because they were not paid the ACV they would have received had Defendant applied proper methodologies and appraisal standards.

50. Were it not for this deceptive and improper adjustment, the "Base Value" in each valuation report would have been higher, resulting in a higher "settlement value" and in turn a higher payment by Defendant for ACV. Specifically, for Plaintiff, were it not for this deceptive

and improper adjustment, the payment of ACV by Defendant would have been $183.40 higher, before adding the related increase in payments for applicable sales taxes.

## CLASS ACTION ALLEGATIONS

51. Plaintiff brings this action individually and as a class action under Fed. R. Civ. P 23(a) and (b), on behalf of the following proposed Class:

> All persons who made a first-party claim on a policy of insurance issued by Artisan and Truckers Casualty Company to an Oregon resident where the claim was submitted from the earliest allowable time through the date an order granting class certification is entered, and Progressive determined that the vehicle was a total loss and based its claim payment on a valuation report from Mitchell where a Projected Sold Adjustment was applied to at least one comparable vehicle.

52. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

53. Plaintiff reserves the right to amend the definition of the Class or add a Class or Subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

54. **Numerosity.** The Class Members are so numerous that joinder of all members is impracticable. While Plaintiff is informed and believes that there are thousands of Class members, the precise number is unknown to Plaintiff but may be ascertained from Defendant's books and records. The identities of Class Members are ascertainable through Defendant's records, Class Members' records, publication notice, self-identification, and other means.

55. **Commonality and Predominance.** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members.

These common questions of law and fact include, without limitation:

    a. Whether Defendant systemically used Mitchell's Vehicle Valuation Reports in adjusting total loss claims to determine ACV;

    b. Whether the Mitchell Vehicle Valuation Reports included Projected Sold Adjustments to the value of the comparable vehicles that reduced the base value, and thus the claim amount paid by Defendant for the ACV of Plaintiff's and Class members' total loss vehicles;

    c. Whether Defendant's improper practices injured Plaintiff and members of the Class;

    d. Whether Defendant's acts violated its obligations under the policy of insurance;

    e. Whether Plaintiff and the Class are entitled to compensatory damages, and if so, the calculation of damages; and

    f. Whether Plaintiff and Class members are entitled to an injunction restraining Progressive's future acts and practices.

56. **Typicality.** The claims of the Plaintiff, who is the representative of the Class herein, are typical of the claims of the proposed Class, in that the claims of all members of the proposed Class, including the Plaintiff, depend on a showing of the acts of Progressive giving rise to the right of Plaintiff to the relief sought herein. There is no conflict between the individually named Plaintiff and the other members of the proposed Class with respect to this action, or with respect to the claims for relief set forth herein.

57. **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the other Class members whom she seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where

insurers breached contracts with insureds. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

58. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

**COUNT 1**
**BREACH OF CONTRACT**
(ON BEHALF OF PLAINTIFF AND THE CLASS)

59. Plaintiff hereby repeats and realleges paragraphs 1-58.

60. This claim is brought by Plaintiff Free on behalf of the Class.

61. Plaintiff Free made a claim for property damage on her Progressive insurance policy.

62. At the time of her claim, Plaintiff was party to an insurance contract requiring Progressive to handle, adjust, and pay insureds the ACV of their total loss claim.

63. At the time of her claim, and in the time since, Plaintiff has performed all obligations under her policy of insurance and was entitled to the benefits she contracted for in her policy.

64. Through the use of improper and unfounded Projected Sold Adjustments in Mitchell vehicle valuation reports, as detailed above, Defendant handled, adjusted, and paid Plaintiff Free's

/ / /

claim, and the claims of the members of the proposed Class, for less than the ACV required by the insurance contract.

65. As a direct result of Defendant's breaches, Plaintiff Free and members of the Class sustained actual damages. Plaintiff Free's damages are at least $183.40 (before calculation of additional sales tax benefits), plus pre-judgment and post-judgment interest.

## COUNT 2
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
(ON BEHALF OF PLAINTIFF AND THE CLASS)

66. Plaintiff hereby repeats and realleges paragraphs 1-58.

67. This claim is brought by Plaintiff Free on behalf of the Class.

68. Every contract, including the Policy, contains an implied covenant of good faith and fair dealing. The purpose of this duty is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract.

69. To the extent the Policy provides Defendant with discretion in calculating the ACV of an insured's total-loss vehicle, Defendant exercised its discretion unreasonably, with an improper motive, and in a manner that was arbitrary, capricious, and inconsistent with the reasonable expectations of the parties by making numerous unfounded, baseless (and false) assumptions, all of which were to detriment of its insureds and to its own benefit. Specifically, Defendant (i) assumed that all data transactions showing a vehicle sold for an amount equal to or exceeding its advertised process are outliers and should be excluded or ignored in determining whether (and in what amount) to apply a PSA to comparable vehicles, and (ii) assumed that every time a vehicle sells for less than its listed price, it must be due to a negotiation off the cash price, and not the far more likely reasons that the purchaser agreed to finance through the dealership, or

/ / /

was entitled to a discount, or agreed to purchase ancillary products, etc., none of which are relevant to the actual *cash* market value of a vehicle.

70. Moreover, despite using the term "projected sold *adjustment*," the PSAs uniformly and without exception reduced the price of comparable vehicles—in other words, the PSA is properly considered a projected sold *reduction*. It is not as if Progressive applied the PSA to increase the price of vehicles listed at a below market amount and decrease the price of vehicles listed at an above market amount compared to other autos in the market. Instead, the PSA always is applied to decrease and never to increase the listed price

71. Defendant Artisan and Truckers Casualty Company breached the covenant of good faith and fair dealing by, *inter alia:*

    a. Intentionally inventing and applying Projected Sold Adjustments to undervalue comparable vehicles, and, in turn, insureds' total-loss vehicles;

    b. Failing to conduct *any* investigation or study or research into whether the Projected Sold Adjustment (i) reflects the used auto market, (ii) is based on accurate data or extrapolations, (iii) is consistent with accepted appraisal methods and practices, or (iv) has any justification whatsoever;

    c. Failing to pay insureds the ACV of their total-loss vehicles;

    d. Interpreting the terms and conditions of their insurance policies in an unreasonable manner solely in an effort to understate the value of total- loss vehicles and avoid paying insureds the ACV on their total-loss claims;

    e. Inventing spurious grounds for undervaluing total loss claims that are hidden, not specific in dollar amount, not adequately explained, and unreasonable.

72. Defendant's breaches of the covenant of good faith and fair dealing have caused damages to Plaintiff Free and the Class. Plaintiff Free and the Class members' damages include

the amounts improperly deducted by Defendant from its payments to insureds on the basis of a Projected Sold Adjustment.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court:

a) determine that this action may be maintained as a class action under Federal Rule of Civil Procedure 32, certify the proposed Class for class treatment, appoint Plaintiff as class representative for the Class, and appoint undersigned counsel as Class Counsel;

b) enter an order finding that Defendant's actions described herein constitute breaches of the express terms of its policies of insurance and a breach of the implied covenant of good faith and fair dealing;

c) award Plaintiff and members of the Class actual damages according to proof;

d) award pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

e) award reasonable attorney's fees and litigation costs and expenses pursuant to applicable law; and

f) grant such other legal and equitable relief as the Court may deem appropriate, including specific performance as an alternative to damages.

/ / /

/ / /

/ / /

Dated: November 20, 2024

                                 Respectfully submitted,

*/s/ Whitney Stark*
**ALBIES & STARK**
Whitney Stark, OSB No. 090350
whitney@albiesstark.com

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis, Florida Bar No. 101754
ashamis@shamisgentile.com
Edwin E. Elliott, Florida Bar No. 1024900
edwine@shamisgentile.com

**EDELSBERG LAW, P.A.**
Scott Edelsberg, Florida Bar No. 0100537
scott@edelsberglaw.com

***Counsel for Plaintiff and the Proposed Class***